IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

KAREN HAMILTON                                    PLAINTIFF

        v.            Civil No. 10-5061

CITY OF SPRINGDALE, ARKANSAS;
SPRINGDALE CITY COUNCIL;
JERRE M. VANHOOSE, INDIVIDUALLY
AND IN HIS OFFICIAL CAPACITY AS
MAYOR; SAM GOADE, INDIVIDUALLY
AND IN HIS OFFICIAL CAPACITY AS
PUBLIC WORKS DIRECTOR; LINDSEY
DROSTE, INDIVIDUALLY AND IN HER
OFFICIAL CAPACITY AS ANIMAL
SERVICES MANAGER; and AMANDA
COOPER, ANIMAL CARETAKER                          DEFENDANTS

                    O R D E R

     Now on this 29th day of June, 2011, comes on for
consideration **Defendants' Motion For Summary Judgment** (document
#11), and from said motion, the supporting documentation, and the
response thereto, the Court finds and orders as follows:

     1.  Plaintiff Karen Hamilton ("Hamilton") alleges that
defendants:

     *    deprived her of due process of law in connection with
her termination, in violation of the **Fourteenth Amendment;**

     *    discriminated against her because of her age;

     *    conspired to violate her rights under the Constitution;

     *    subjected her to retaliation, in violation of the **First
Amendment to the U.S. Constitution** and the **Whistleblower
Protection Act of 2007;** and

     \*    violated her rights under the **Family and Medical Leave Act.**

In addition, Hamilton alleges violations of the Arkansas Civil Rights Act; intentional infliction of emotional distress under Arkansas law; defamation under Arkansas law; interference with the right to contract under Arkansas law; and violation of the Arkansas Whistleblower Act.  She seeks declaratory and injunctive relief, compensatory and punitive damages, costs and attorney fees.

Defendants answered and denied the material allegations of the Complaint, and now move for summary judgment on all of Hamilton's federal claims.  They further suggest that if summary judgment is granted as to all the federal claims, the Court should decline to hear the pendant state law claims.  The motion is fully briefed and ripe for decision.

2.  The standard governing evaluation of a motion for summary judgment has recently been summarized as follows:

> [S]ummary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.  The movant bears the initial responsibility of informing the district court of the basis for its motion, and must identify those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact.  If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial. . . . The nonmovant must do more than simply show that there is some metaphysical doubt as to the material

facts, and must come forward with specific facts showing that there is a genuine issue for trial.  Where the record as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.

**Torgerson v. City of Rochester**, **--- F.3d ---, 2011 WL 2135636 (8th Cir. 2011)** (internal citations and quotation marks omitted).

Where there are genuine factual disputes, the Court is required to view the evidence and draw reasonable inferences in the light most favorable to the party opposing summary judgment. **Scott v. Harris**, **550 U.S. 372, 378 (2007)**.

3.  Pursuant to **Local Rule 56.1**, the parties have filed statements of facts which they contend are not in dispute. From those statements[1], the following significant undisputed facts are made to appear:

*    Hamilton became an employee of the City of Springdale, Arkansas ("Springdale" or "the City") in 1993.[2]  She worked as an Animal Technician in the City's Animal Services Shelter ("the Shelter").

*    At all times relevant to this case, defendant Sam Goade ("Goade") was the Public Works Director for the City.

*    Defendant Lindsey Droste ("Droste") was hired by the

[1]The process of sifting through this material was significantly hampered by the tendency of both sides to argue their cases in their statements of fact;  the Court believes, however, that what has emerged is a statement of facts that neither side truly disputes.

[2] While defendants say Hamilton had worked for the City since 1986, it appears that she actually, as of that year, helped originate and manage an organization known as Adopt-a-Pet, which was "absorbed" by the City in 1993.

-3-

City in 2006 as Animal Services Supervisor.[3]  Droste became Animal Services Manager in the Summer of 2007.  From that point forward, Droste was Hamilton's supervisor; Goade was Droste's supervisor.

     *    Upon becoming Shelter Manager, Droste instituted changes in the procedures for animal euthanasia.  Over a period of some six months, employees were provided training on the new procedure by Mitzi O'Dell ("O'Dell").

     *    Shortly after becoming Manager at the Shelter, Droste heard about an incident in which Hamilton referred to two co-workers as "snitches and bitches" and stated that they "better watch their backs."  Droste reported this incident to Goade, and Goade issued Hamilton a First Written Warning of Violation.  He cited Section 3.5 A.13 of the Springdale Personnel and Procedures Manual (the "Personnel Manual") and stated that "[s]tatements of this nature in the presence of fellow employees is [sic] considered conduct unbecoming of an employee of the City and adversely affects [sic] the morale of the other employees and the department in general."  Hamilton was directed to conduct herself "in a manner consistent with the City's personnel policy," and warned that failure to do so would "result in further disciplinary action including suspension from duty without pay for five (5)

_____

     [3]In Droste's deposition, she testified that starting in about March, 2006, she worked for the City for a year and a half as an "animal welfare officer or animal control officer," which appears to have involved tasks outside the Shelter.  As near as the Court can determine, Droste was not employed within the Shelter until she became Animal Services Manager.

working days."

    *    On October 16, 2007, both Droste and Hamilton contacted Goade, wanting to speak with him.  These requests were occasioned by a verbal altercation between the two women over a parking space, during which Hamilton told Droste that Droste's policies were "bullshit."  Hamilton was not disciplined over this incident, but it was noted in her personnel file.

    *    Also in October, 2007, Hamilton and Droste were involved in an incident over a cat head that was to be tested for rabies, which resulted in Hamilton complaining to Goade about Droste not following state law.  Droste was not disciplined over this incident.

    *    O'Dell informed Droste that Hamilton wanted to continue performing euthanasia using the former procedure, rather than the new one instituted by Droste.  In December, 2007, O'Dell wrote Droste a memo stating that Hamilton should not "be in the rotation of performing euthanasia."

    *    On February 12, 2008, Hamilton was suspended for alleged inhumane treatment of a dog during euthanasia.

    *    Hamilton appealed her suspension to defendant Jerre Van Hoose ("Van Hoose"), Mayor of Springdale.  Van Hoose, relying only on information supplied by Goade, and without interviewing Hamilton, determined that Hamilton's actions were "cruel and deplorable" and were in violation of the Personnel Manual.  Van

Hoose further determined that five days' suspension  was too
lenient, and terminated Hamilton.

    *    Hamilton appealed her termination to the City Council,
which upheld her suspension but overturned her termination.

    *    Hamilton did not return to work after the City Council
overturned her termination, taking medical leave instead.  She
attempted to return to work on May 19, 2008, but Droste told her
she would have to have a doctor's release.  Hamilton's doctor did
not release her, giving her instead a note stating that she should
remain off work.

    *    On June 10, 2008, the City sent Hamilton a certified
letter stating that because she had failed to call in or report to
work in violation of the Personnel Manual, she was considered to
have voluntarily resigned.  This letter was, however, returned as
undeliverable.

    *    The City established June 30, 2008, as Hamilton's
termination date, and sent her two letters detailing her options
under COBRA and asking for the return of her uniforms.  Hamilton
did not respond to these letters.

    *    On July 21, 2008, Hamilton wrote a letter to the City,
stating that she had learned of her termination when she watched
a City Council meeting, and that she had not resigned.

    *    On August 13, 2008, Van Hoose wrote Hamilton, notifying
her that she had been terminated for "voluntary resignation/job

abandonment."

     *   Hamilton appealed this second termination, but did not appear at the appeal hearing.  The City Council upheld the termination decision.

     4.   The Court first considers whether summary judgment is appropriate on Hamilton's claim that she was deprived of due process of law in connection with her termination[4], in violation of the **Fourteenth Amendment**.  This claim arises under **42 U.S.C. § 1983**, which provides that

> {e}very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States  . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . .

The Due Process Clause of the **Fourteenth Amendment** provides that no State shall "deprive any person of life, liberty, or property, without due process of law."

     Defendants argue that Hamilton cannot prevail on this claim because it depends on her having a property interest in her job, which she did not have because she was an employee at will.  While not conceding that she was an employee at will, Hamilton offers no evidence that she had a continuing expectation of employment with the City, relying instead on the proposition that she had a

---

[4]Hamilton was actually terminated twice, first in March, 2008, and again in June, 2008.  The Court understands the due process claim to relate to the first termination, and has so analyzed it.

-7-

protected liberty interest that was infringed.

The Eighth Circuit has explained the way in which a protected liberty interest arises as follows:

> To establish protected liberty interests, plaintiffs [are] required to establish that a [government] official, in connection with discharging plaintiffs, publicly made allegedly untrue charges against them that would stigmatize them so as to seriously damage their standings and associations in their community, or foreclose their freedom to take advantage of other employment opportunities.
>
> *        *        *
>
> In reviewing whether allegedly defamatory statements are sufficient to warrant a right to a name clearing hearing, [t]he requisite stigma has generally been found when an employer has accused an employee of dishonesty, immorality, criminality, racism, and the like.

**Stodghill v. Wellston School District**, 512 F.3d 472, 476 (8th Cir. 2008) (internal citations and quotation marks omitted).

5.    The relevant evidence on this issue is as follows:

*    Hamilton had been employed at the Shelter since 1993, and had been involved with its predecessor organization, Adopt-A-Pet, since 1986.  She had been performing euthanasia during all that time.

*    Goade's Disciplinary Notice suspending Hamilton over the euthanasia incident stated his finding that Hamilton "did not perform a humane euthanasia on the golden mix in question.  My finding is that employee Karen Hamilton had the option of administering a pre-mixed Ketamine/Xylaxine tranquilizer to this

dog that would have made the euthanasia process more humane. However, Miss Hamilton neglected to administer this tranquilizer intramuscularly and in turn the dog did not pass away quickly or humanely."

* Hamilton appealed her suspension to Van Hoose. Van Hoose reviewed the documentation presented to him (which had been selected by Goade and Droste), and talked with Goade and Droste, but refused to hear Hamilton's side of the story.

* Hamilton testified that much of Cooper's written version of the euthanasia incident was inaccurate, and that she asked Van Hoose if she could talk to him about the matter, or if he would talk to other employees. When he refused, she wrote him a letter in which she set out her version of the euthanasia incident.

* Hamilton's co-worker Karen Jobe ("Jobe") averred that Hamilton was suspended for being "cruel and inhumane to an animal," and that "[n]o one who knew [Hamilton] could have believed such an allegation." When Hamilton appealed the suspension, Jobe planned to speak to Van Hoose on her behalf, but averred that Droste found out about her plans and warned her not to follow through. Jobe took this as a threat, and did not speak with Van Hoose.

* Van Hoose resolved the appeal by terminating Hamilton. In his letter of termination, he stated that in his opinion, Hamilton's actions were "cruel and deplorable," and that her

"behavior, conduct, and attitude in this matter are far more reprehensible than that warranting a suspension."

* Hamilton appealed Van Hoose's termination. The Personnel Committee of the City Council conducted a hearing in connection with this appeal, at which Droste testified that "euthanasia at the shelter was inhumane in the past," and that the method used was "inhumane" and "very barbaric."

* Hamilton had an opportunity at the hearing to speak on her own behalf, and her sister was allowed to speak on her behalf as well.

* The City overturned Hamilton's termination but not the discipline imposed by Goade.

6. The foregoing evidence will not, in the Court's view, support a due process claim arising from a protected liberty interest. Assuming, without deciding, that Van Hoose's reasons for the termination were sufficiently stigmatizing under **Stodghill**, there is no evidence that any City employee made those reasons public before the Personnel Committee hearing, which was held at Hamilton's request.

Moreover, any deprivation of a liberty interest only arises when the affected employee is not given an opportunity to clear her name. **Rush v. Perryman, 579 F.3d 908, 912 (8th Cir. 2009).** Hamilton had such an opportunity at the hearing conducted by the Personnel Committee.

-10-

For these reasons, the Court finds that summary judgment is appropriate on Hamilton's due process claim.

7. Defendants next contend that Hamilton cannot establish the elements of her age discrimination claim, because she cannot show that she was performing her job as reasonably expected, nor that age discrimination was the cause of any adverse employment action.

In order to make out a prima facie case of age discrimination, Hamilton must prove the following:

(a) that she was over 40 years of age;

(b) that she was meeting the legitimate expectations of her employer;

(c) that she was subjected to an adverse employment action; and

(d) that there are facts giving rise to an inference that age discrimination was the reason for the adverse employment action.

If Hamilton presents a prima facie case, the City then must articulate a legitimate, nondiscriminatory reason for the adverse employment action, following which Hamilton must show that the proffered reason is merely a pretext for unlawful discrimination. **Zhuang v. Datacard Corp.**, **414 F.3d 849, 854 (8th Cir. 2005)**.

8. The Court finds that Hamilton can present a prima facie case of age discrimination.

-11-

(a)   There is no dispute that Hamilton was over 40 years of age when the events in suit occurred.

(b)   There is evidence from which a jury could find that Hamilton was meeting the legitimate expectations of the City up to the point that Droste became her supervisor.  Hamilton had worked for the City for many years, received positive evaluations, and had only minor job-related problems until that time.  Indeed, Droste herself evaluated Hamilton on July 31, 2007, shortly after becoming Manager.  Droste rated Hamilton above average in 10 out of 14 categories, and gave her an overall satisfactory evaluation.  This was just two days before Droste stated in an e-mail to O'Dell that she "would really like for my other employees to finish their training so that I can drop the bombshell and ask [Hamilton] to back away from the euth for a while."

(c)   There is evidence from which a jury could find that Hamilton suffered an adverse employment action.  The Court has reference not to Hamilton's March, 2008, termination, but to the discipline meted out by Goade on February 12, 2008.  (Because the initial termination was set aside by the City on appeal, it will not support Hamilton's age discrimination claim.)

An adverse employment action is defined as "a *material* employment disadvantage, such as a change in salary, benefits, or responsibilities," and may include actions that "disadvantage or interfere with an employee's ability to do his or her job."

**Tademe v. Saint Cloud State University**, **328 F.3d 982, 992 (8th Cir. 2003)** (internal citations and quotations omitted)(race discrimination case). A transfer which "results in a significant change in working conditions" amounts to an adverse employment decision. **Fisher v. Pharmacia & Upjohn**, **225 F.3d 915, 919 (8th Cir. 2000)** (age discrimination case).

Goade's discipline was a five-day suspension without pay and indefinite suspension from the euthanasia rotation and access to the controlled drug safe. The evidence before the Court includes a job description for Hamilton's position of Animal Technician. One of the ten duties therein listed is "[e]uthanize animals that are not adoptable or are too sick to save." Another is "[k]eep records of drugs used and order when needed." Another is "[a]dminister drugs and take care of hurt or sick animals." The evidence suggests that Goade's discipline directly affected three of the ten specific responsibilities of Hamilton's job. It also affected her pay, since the suspension was without pay. Given these aspects of the discipline, a jury could conclude that it was an adverse employment action.

(d) There is evidence from which a jury could conclude that age discrimination was the reason for Goade's action:

* Droste testified that the major change she instituted when she became Manager was to change the euthanasia procedure, from cardiac injections to intravenous injections.

-13-

* Hamilton -- one of two employees who had been doing euthanasia when Droste took over -- testified that Droste "referred to my old ways continually, and I don't know why. They weren't my old ways, they was the way the City ran."

* An e-mail from Droste to O'Dell on August 2, 2007, stated that Droste "would really like for my other employees to finish their training so that I can drop the bombshell and ask [Hamilton] to back away from the euth for awhile."

* Hamilton testified that when the "cat head" incident arose in October, 2007, Droste called her into the office and said "I think you're too old to change. Don't you think you need to seek a new profession?"

* On December 13, 2007, Droste e-mailed O'Dell, the euthanasia trainer, asking her to put in writing her opinions of Hamilton, and stating "I will be passing this on to my supervisor. I am worried that her lack of compassion will never change and I would like your thoughts in writing as to what you have experienced with her as far as resistance, etc. goes."

* O'Dell responded with a memo which included her opinion that "I have a concern about one of your employees that shows no compassion or feeling while in the euthanasia room. This is Karen Hamilton, I know she has been at the shelter for along [sic] time but she is one person that I do not believe will ever change the way she thinks about euthanasia. . . . You know the old saying

-14-

'you can't teach an old dog new tricks' I never believe that because I am an old dog and I am always willing to learn something new everyday I do this job. . . . But if you are trying to teach someone something and they already think they know all there is to know and are not willing to be open minded enough to try new ways of doing things then we are wasting our time. . . ."

A jury could conclude from the foregoing that the Droste was motivated by age discrimination to take steps to cut back Hamilton's job responsibilities and reduce her pay.

9.   The next step in the burden-shifting analysis -- articulation by the City of a legitimate, nondiscriminatory reason for the adverse employment action -- is not onerous and need not even be made by a preponderance of the evidence. **Stallings v. Hussmann Corp.**, **447 F.3d 1041, 1052 (8th Cir. 2006)**. The City satisfied this step by citing Section 3.5 A.13 of the Personnel Manual, "conduct unbecoming an employee of the City." Such conduct is defined as conduct that adversely affects morale, operation or efficiency of the City, or has a tendency to adversely affect, lower or destroy public respect and confidence, or conduct which brings disrepute or discredit upon the employee, department or City.  The conduct recited in the Notice was "did not perform a humane euthanasia" on a particular dog.

10.   Finally, the Court finds that a jury could conclude that the articulated reason for Goade's discipline was a mere pretext

for age discrimination.  The following evidence is relevant to this portion of the age discrimination inquiry:

* The method by which Hamilton carried out the euthanasia in question was the new method Droste had implemented, intravenous injection.

* Cooper did not report any problems with the euthanasia in question for two weeks after it happened.

* The problem Hamilton encountered was a "blown vein," and not just one, but multiple blown veins, which complicated the euthanasia.  Droste testified that blown veins are not uncommon, and that she had encountered them herself when performing euthanasia.

* Droste testified before the Personnel Committee that at the time of the incident there were no formal procedures in place about when a tranquilizer was to be used in the euthanasia process, and no policy that an employee could be disciplined for mistakes during euthanasia.

* When Droste had presented O'Dell's "can't teach an old dog new tricks" memo to Goade, he told her they could not take any action based on it, and that Droste would need to have "some kind of policy violation."

* In formulating discipline for the euthanasia incident, Goade relied entirely on Droste for information about the accepted policy and practice for euthanasia.  Goade and Droste jointly

-16-

drafted the Disciplinary Notice which identified the applicable policy as Section 3.5 A.13 of the Personnel Manual.  This was the same section identified in the Disciplinary Notice issued to Hamilton about the "snitches and bitches" incident.

A jury could conclude from this evidence that there really was not anything particularly untoward about the euthanasia incident in question, and that it was blown out of proportion by Droste to get Hamilton fired. A jury could also conclude that Droste knew there was no violation of any euthanasia policy -- because there was none -- and cited a violation of the Section 3.5 A.13 of the Personnel Policy not because it fit the facts, but because it coincided with the citation in the July, 2007, Disciplinary Notice.  That Notice warned Hamilton that a second violation of the section would be grounds for "further disciplinary action including suspension from duty without pay for five (5) working days."

If a jury did draw these conclusions, and did determine that the reason given by Goade for Hamilton's discipline was not the real reason, that fact, combined with the other facts relevant to her age discrimination claim, could support a finding of age discrimination.  See **Reeves v. Sanderson Plumbing Products, Inc.**, **530 U.S. 133, 147 (2000)**:

> Proof that the defendant's explanation is unworthy of
> credence is simply one form of circumstantial evidence
> that is probative of intentional discrimination, and it
> may be quite persuasive. . . .  In appropriate

> circumstances, the trier of fact can reasonably infer
> from the falsity of the explanation that the employer
> is dissembling to cover up a discriminatory purpose.
> Such an inference is consistent with the general
> principle of evidence law that the factfinder is
> entitled to consider a party's dishonesty about a
> material fact as affirmative evidence of guilt.
> Moreover, once the employer's justification has been
> eliminated, discrimination may well be the most likely
> alternative explanation, especially since the employer
> is in the best position to put forth the actual reason
> for its decision. . . . Thus, a plaintiff's prima facie
> case, combined with sufficient evidence to find that
> the employer's asserted justification is false, may
> permit the trier of fact to conclude that the employer
> unlawfully discriminated.

(Internal citations and quotation marks omitted.)

11. For all the foregoing reasons, the Court concludes that the City is not entitled to summary judgment on Hamilton's age discrimination claim. The Court will, however, grant summary judgment on this claim in favor of the individual defendants in their individual capacities, on the basis of their argument that there is no basis for individual supervisor liability on the age discrimination claim. Defendants cite **Drye v. University of Arkansas for Medical Sciences**, 2011 WL 30097 (E.D. Ark. 2011), which in turn relies on **Stults v. Conoco, Inc.**, 76 F.3d 651, 655 (5th Cir. 1996). While there is no controlling precedent in this Circuit, **Lenhardt v. Basic Institute of Technology, Inc.**, 55 F.3d 377, 380 (8th Cir. 1995), cites a number of other Circuits that have so held, reflecting what it calls "a clear consensus on the issue," and the Court finds these cases persuasive. For that

-18-

reason, Hamilton's age discrimination claim will be deemed to lie only against the City, her employer, for the actions of its supervisory personnel.

12.  Defendants contend that Hamilton cannot show that they violated her rights under the **First Amendment** or the **Whistleblower Protection Act of 2007.**  Alternatively, if the Court finds that Hamilton can go forward on her retaliation claim, the individual defendants in their individual capacities claim the protection of qualified immunity, and the City and the individual defendants in their official capacities claim that they are entitled to summary judgment because there is no showing that any official policy or custom was involved.

14.  The prima facie elements of a retaliation claim are:

   *    that the plaintiff engaged in protected conduct;

   *    that she suffered an adverse employment action; and

   *    that there was a causal connection between the protected conduct and the adverse employment action.

**Kiel v. Select Artificials, Inc.**, **169 F.3d 1131, 1136 (8th Cir. 1999).**

Hamilton's retaliation claim, as the Court understands it, is that she was subjected to retaliation in the form of a five-day suspension without pay and loss of her job duties involving euthanasia because she complained that Droste violated state law by failing to transport for testing the head of an animal

suspected to have rabies and known to have bitten a person.

13.  The Court believes there is evidence from which a jury could find that Hamilton engaged in protected conduct: speech. A governmental employer may place restrictions on the speech of an employee, but that employee remains a citizen, and such restrictions must be limited to their purpose.  The First Amendment protects speech made at work -- even speech related to the speaker's job -- unless the speech is made pursuant to the employee's job duties.  **Garcetti v. Ceballos, 547 U.S. 410, 421 (2006).**  Speech is protected if it is "made as a citizen on a matter of public concern," i.e., "it relates to a matter of political, social, or other community concern."  **Dahl v. Rice County, Minn., 621 F.3d 740, 744 (8th Cir. 2010).**

(a)  The available evidence, viewed in the light most favorable to Hamilton, could support a jury finding that Hamilton's speech regarding the cat head was not a part of her job duties.  Nothing about rabies testing is listed in the description of the job duties of an Animal Technician.  In a written statement regarding the meeting with Goade and Droste in October, 2007, about the cat head, Hamilton wrote that Goade asked her "why I couldn't just let it go, and let Lindsey get herself in trouble."  This means of handling the matter would, of course, not have been an option to one whose job duty it was to speak up about the cat head, or to insure that rabies testing was carried out as required

by regulations.

(b)  The evidence could also support a jury finding that Hamilton's speech related to a matter of "community concern." There is evidence that rabies is almost invariably fatal, and that the cat head in question was designated for rabies testing because the cat had bitten a person.

Also in the record are the Arkansas State Board of Health Rules and Regulations Pertaining to Rabies Control ("Regulations"), which authorize health or law enforcement authorities to order a ten-day period of confinement, quarantine, and observation of any dog or cat that has bitten a human.  The Regulations further provide that "[i]f the dog or cat dies or is killed during the 10-day observation period, intentionally or unintentionally, the head shall be shipped immediately to the Public Health Laboratory as outlined in Section I.J."  Section I.J. contains technical details about how to make such shipment, and notes that "[b]ecause a human life may be endangered, and because early diagnosis of rabies is highly advantageous in selecting treatment for the victim, the fastest and most direct transportation is encouraged."

Hamilton testified that the cat head sat in the freezer for several weeks, then co-worker Pamela Sen ("Sen") came to her and said Droste had told her to "[j]ust throw it away.  Just throw it in the Dumpster."  Hamilton went to Droste and said "we cannot

throw that away.  It's against Health Department regulations.  We have to take that down to the health department."  Droste replied "I don't appreciate you telling me what to do," and "rushed out the back gate" with the bucket containing the head.  At that point, according to Hamilton, she felt she had to call Goade.  She testified that she told Goade what was happening, and asked to come talk to him, but he refused to talk to her without Droste being present.

14.  Hamilton must also show that she suffered an adverse employment action.  As with age discrimination claims, an adverse employment action is a material employment disadvantage, such as a change in salary, benefits, or responsibilities.  **Meyers v. Starke, 420 F.3d 738, 744 (8th Cir. 2005)**.  The Court has already analyzed whether Hamilton sustained an adverse employment action, and has found that a jury could so conclude.  It need not repeat that analysis.

15.  Finally, the Court believes the evidence could support a finding of causal relationship between Hamilton's speech and her suspension.  The cat head incident took place in the middle of October, 2007, culminating in the meeting between Droste, Goade, and Hamilton on October 17, 2007.  Sen averred that afterwards, Droste's attitude and behavior toward Hamilton "changed to the worse."  On February 12, 2008, Hamilton was suspended over the euthanasia incident.

For these reasons, summary judgment on Hamilton's First Amendment retaliation claim is not appropriate.

16.   Defendants contend that Hamilton cannot make out a claim of retaliation under the **Whistleblower Protection Act of 2007**, because it only protects federal employees.  Hamilton did not cite any statute number for this Act in her Complaint, and the Court has been unable to locate such a statute.  It has, however, found a reference to "the Whistleblower Enhancement Protection Act of 2007 (H.R. 985)" in an unpublished case, **Yates v. John Marshall Law School, 2008 WL 4358313 (N.D. Ill. 2008)**.  That reference, found in a footnote,  is to the effect that "this bill has not yet been signed into law."   The same footnote states that "the Whistleblower Protection Act of 1989 (which may ultimately be amended by H.R. 985) 'protects the employees of federal agencies'," thus echoing and supporting defendants' argument on this issue.

Given Hamilton's failure to cite a specific statute, and the indications that the statute she has cited by its reference name has not been enacted into law, the Court finds that summary judgment on this claim is appropriate.

17. Defendants also contend that they have qualified immunity for Hamilton's First Amendment retaliation claim.  They contend that, even if a First Amendment violation occurred, a reasonable officer would not have known that the right was clearly

established at the time of the violation.

Qualified immunity "shields a public official from liability for civil damages when his conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  A public official is entitled to qualified immunity

> unless (1) the evidence, viewed in the light most favorable to [plaintiff], establishes a violation of a constitutional or statutory right, and (2) the right was clearly established at the time of the violation, such that a reasonable official would have known that his actions were unlawful.

**Gardner v. Board of Police Commisioners For Kansas City, Missouri**, **--- F.3d ---, 2011 WL 2226490 (8th Cir. 2011)** (internal quotation marks omitted).

The Court has already determined that Hamilton can proceed to a jury on the basis of her evidence that her First Amendment rights were violated, thus satisfying the first aspect of the qualified immunity analysis.  It turns now to a consideration of whether a public employee's right to protected speech was clearly established in 2007 and 2008, when the events in suit took place.

In **Pickering v. Board of Education**, **391 U.S. 563, 574 (1968)**, the Supreme Court held that a public employee's "right to speak on issues of public importance may not furnish the basis for his dismissal from public employment." In **Givhan v. Western Line Consolidated School District**, **439 U.S. 410 (1979),** the Supreme

Court recognized that the First Amendment protects speech made privately to a public employee's employer, to the same extent such speech would be protected if it were made publicly.

In **Connick v. Myers**, **461 U.S. 138, 147 (1983)**, the Court refined its earlier public employee free speech holdings, saying that "when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior."

From these cases, it can be seen that at least since 1983, the constitutional underpinnings for Hamilton's First Amendment claim have been clearly established law. Moreover, the City followed these principles in its Whistleblower Policy, set out at Section 3.5 of the Personnel Manual, which provides that "employees are encouraged to bring to the attention of the City any improper actions of City officials and employees. The City will not retaliate against any employee who makes such a disclosure in good faith and in accordance with the procedures set forth in this Policy."

Given the Supreme Court cases cited herein, and the City's own Whistleblower Policy, the Court finds that defendants are not entitled to qualified immunity on Hamilton's First Amendment

retaliation claim.

18. The City, and the individual defendants in their official capacities, contend that they are entitled to summary judgment on the retaliation claim because there is no evidence that any official policy or custom led to retaliation.

A suit against a public official in his or her official capacity is simply an action against the entity of which the individual is an agent, and some policy or custom of the entity "must have played a part in the violation of federal law" for liability to attach. **Kentucky v. Graham, 473 U.S. 159, 166 (1985).** Defendants contend that Hamilton cannot show the existence of any such policy or custom.

Hamilton responds that she "is not alleging an actual, formal policy of the City" but rather "that the City and its officials undertook an informal practice or custom of not training its officials as to City policies and of failing to discipline its officials when they refused to adhere to those policies," thus "creating the very atmosphere" which allowed the circumstances alleged in her Complaint to occur. She points to Goade's testimony that he was not given any training in administration or the enforcement of City rules and regulations, and evidence that Goade and Van Hoose were unfamiliar with City regulations regarding the handling of rabies specimens.

Hamilton has failed to offer sufficient evidence in support

of her "failure to train" theory.   As explained in **Connick v. Thompson**, 131 S.Ct. 1350, 1359 (2011):

> In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983.  A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train. . . . To satisfy the statute, a municipality's failure to train its employees in a relevant respect must amount to deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.  Only then can such a shortcoming be properly thought of as a city policy or custom that is actionable under § 1983.
>
> [D]eliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action.  Thus, when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program.

(Internal citations and quotation marks omitted.)

Hamilton has presented nothing that would rise to the level of proof required by **Connick**.  There is no evidence that City policymakers were on notice that any lack of training might cause a First Amendment violation.  Nor is there any evidence that the City, knowing of some misdeed by one of its employees in this matter, failed to discipline him or her.  Summary judgment will, therefore, be granted to the City, and to all defendants in their official capacities, on Hamilton's retaliation claim.

19.  Defendants argue that Hamilton cannot present a prima

-27-

facie case of conspiracy to violate her rights under **42 U.S.C. § 1985,** because such a claim would require her to show a conspiracy motivated by discriminatory animus arising out of her race, color, religion, sex or national origin, whereas she alleges discrimination because of her age.

> The statute in question provides as follows:

> If two or more persons in any State . . . conspire . . . for the purpose of depriving, either directly or indirectly, any person . . . of the equal protection of the laws, or of equal privileges and immunities under the laws . . . ; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

**42 U.S.C. § 1985(3).**

In the absence of cases deciding whether **§ 1985** can be used to assert an age discrimination claim, the Court has looked to cases that have considered whether an age discrimination claim can be asserted under **42 U.S.C. § 1983.** These cases are instructive because **§ 1985,** like **§ 1983,** does not create rights, it merely provides a vehicle to vindicate rights conferred by the Constitution or laws of the United States. **<u>Great American Federal Savings & Loan Ass'n v. Novotny</u>, 442 U.S. 366, 376 (1979); <u>Gatlin ex rel. Estate of Gatlin v. Green</u>, 362 F.3d 1089, 1093 (8th Cir.**

-28-

2004).

Most cases that have considered the issue hold that the ADEA is the exclusive remedy for age discrimination.  See, *e.g.*, **Ahlmeyer v. Nevada System of Higher Education**, 555 F.3d 1051, 1060 (9th Cir. 2009); **Lafleur v. Texas Department of Health**, 126 F.3d 758 (5th Cir. 1997); **Zombro v. Baltimore City Police Department**, 868 F.2d 1364, 1369 (4th Cir. 1989).

There is one case in the Eighth Circuit to the contrary, **Mummelthie v. City of Mason City, Iowa**, 873 F.Supp. 1293 (N.D. **Iowa 1995), aff'd, 78 F.3d 589 (8th Cir. 1996),** but the Court declines to follow it.  The analysis of the District Court has not been adopted by any other court, and the Eighth Circuit's affirmance was based not on that analysis, but on the fact that Mummelthie presented no evidence of age discrimination.

The Court is persuaded by the cases finding that the ADEA is the exclusive remedy for age discrimination, which is dispositive of Hamilton's § 1985 claim.  One of the essential elements of a claim under § 1985(3) is injury to the person or property of the plaintiff or deprivation of a right or privilege of citizenship.  **Larson by Larson v. Miller**, 76 F.3d 1446 (8th Cir. 1996).  Hamilton claims injury caused by a conspiracy to discriminate against her because of her age, which is simply another way of seeking relief for age discrimination.  Since the ADEA is her exclusive remedy, the Court concludes that Hamilton's § 1985 claim

-- to the extent it relies on age discrimination -- should be dismissed.

20. Hamilton contends, however, that her conspiracy claim is related to her First Amendment retaliation claim, and that she has presented evidence that Droste and O'Dell conspired to violate her First Amendment rights. The Court has found evidence from which a jury could conclude that Droste enlisted O'Dell to help her develop a case to present to Goade, in connection with Hamilton's age discrimination claim. Hamilton points to no evidence that would link O'Dell to any animus based on the First Amendment, however. In the absence of any such evidence, the Court finds that summary judgment is appropriate as to all defendants on Hamilton's conspiracy claim.

21. Defendants contend that they are entitled to summary judgment on Hamilton's claim under the **Family and Medical Leave Act** ("FMLA"), because Hamilton received the 12 weeks of protected leave she was entitled to under the Act -- and more -- and failed to return to work at the conclusion of this leave.

The FMLA provides for a period of twelve weeks' leave in any twelve-month period for an employee with a "serious health condition that makes the employee unable to perform the functions of the position of such employee." **29 U.S.C. § 2612(a)(1)**. At the end of this leave, the employee is entitled to be restored to her original position, or an equivalent one. **29 U.S.C. § 2614**.

-30-

This job protection is not indefinite, however.  Many courts have found that if an employee fails to return to work after the twelve week period ends, she is not entitled to job restoration. See, e.g., **Hunt v. Rapides Healthcare System, LLC**, 277 F.3d 757, **763 (5th Cir. 2001)**; **Hicks v. Leroy's Jewelers, Inc.**, 225 F.3d 659 **(6th Cir. 2000)** (unpublished); and **Beckendorf v. Schwegmann Giant Super Markets, Inc.**, 134 F.3d 369 (5th Cir. 1997) (unpublished).

The evidence on this issue is as follows:

*    David Tritt ("Tritt"), Human Resources Director for the City, testified that after her termination was overturned by the City Council, Hamilton was allowed "administrative leave" until March 17, 2008.  Hamilton did not return on March 17, submitting instead a note from Dr. Cooper that took her off work.      *

*    Tritt sent Hamilton a certified letter on June 10, 2008, notifying her that since she had failed to call in sick or report for work since June 4, 2008 -- when she was scheduled to see Dr. Cooper -- she was "considered to have voluntarily resigned . . . by reason of abandonment of position."  This letter went unclaimed.

*    On July 21, 2008, Hamilton sent Goade a letter stating that she had seen a June 24 City Council meeting on television, and learned that she was considered to have resigned.  She stated that "at no time have I ever resigned my position as Animal Technician or my employment with the City of Springdale," and that

-31-

she was "doing all that I can to get well, and . . . I look forward to returning to my position. . . ."

* Tritt sent Hamilton a letter on July 24, 2008, informing her that her "termination date was established as June 30, 2008 by reason of voluntary resignation/job abandonment."

This evidence, which is uncontroverted, indicates that Hamilton was on leave as an employee from March 18, 2008, until June 30, 2008, a period of more than twelve weeks. That being the case, there is no merit to her FMLA claim, and summary judgment as to that claim will be granted.

22. Defendants suggest that Hamilton's state law claims should be dismissed, but their suggestion is predicated entirely on their expectation that all of her federal claims would be dismissed. That has not occurred.

Defendants also suggest that if the Court should retain jurisdiction over the state law claims, summary judgment should be granted on them for "all the reasons stated above" in connection with the federal claims. This, of course, cannot be done. Each claim must be analyzed on the basis of its own elements, which often differ even between very similar state and federal claims. The state claims will not, therefore, be dismissed.

**IT IS THEREFORE ORDERED** that **Defendants' Motion For Summary Judgment** (document #11) is **granted in part and denied in part**.

The motion is **denied** insofar as it seeks summary judgment on

Hamilton's claim that she was subjected to discrimination because
of her age; her claim that she was subjected to retaliation in
violation of the **First Amendment;** and her state law claims.

The motion is **granted** in all other respects.

**IT IS SO ORDERED.**

**/s/ Jimm Larry Hendren**
**JIMM LARRY HENDREN**
**UNITED STATES DISTRICT JUDGE SEY**
